UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

ERP Operating Limited Partnership,          :

               Plaintiff,          :

     -against-          :

Bashir Elmegaryaf,          :

              Defendant.          :

-------------------------------------------------------X

| : | INDEX NO.: _____ |
| : | **COMPLAINT** |

Plaintiff ERP OPERATING LIMITED PARTNERSHIP ("Equity" or "Plaintiff"),

through its undersigned attorneys Baker & Hostetler LLP, for its Complaint against Defendant

Bashir Elmegaryaf ("Elmegaryaf" or "Defendant"), alleges as follows:

## INTRODUCTION

Equity brings this Complaint against Mr. Elmegaryaf, a former employee of Equity's in-house Investments team, because Mr. Elmegaryaf, *inter alia,* accessed, downloaded and, in some instances, emailed to one or more personal devices over 12,000 documents containing Equity's confidential and trade secret information immediately before leaving Equity to work for a competitor (the "Incident"). When Equity became aware of the Incident, it immediately confronted Mr. Elmegaryaf. Rather being forthright, Mr. Elmegaryaf misled Equity about his actions and intentions and tried to erase the digital evidence of his actions. By this Complaint, Equity seeks to ensure the security of its confidential and trade secret information and to obtain relief for the damages that Mr. Elmegaryaf's brazen conduct has inflicted.

## THE PARTIES

1.    Plaintiff ERP Operating Limited Partnership is an Illinois limited partnership, with its main office and principal place of business located in Chicago, Illinois.

2.      Defendant Bashir Elmegaryaf was, at the time he gave notice of his resignation on March 1, 2022, an Assistant Vice President at Equity's office in Manhattan. Mr. Elmegaryaf is a citizen of New York because, at all relevant times, he has resided in New York, New York 10001.

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically the Defend Trade Secrets Act, 18 U.S.C. § 1836.

4.      This Court has supplemental jurisdiction over Equity's state law claims under 28 U.S.C. § 1367(a), because those claims are so related to the claim under the Defend Trade Secrets Act, 18 U.S.C. § 1836, that they form part of the same case or controversy.

5.      This Court has personal jurisdiction over Defendant pursuant to New York Civil Practice & Rules § 301 (McKinney 2001).

6.      Venue is proper in this District under 28 U.S.C. § 1391(b)(1) & (2) because Defendant is domiciled and thus resides in this judicial district and because a substantial part of the events giving rise to Equity's claims occurred in this judicial district.

## MR. ELMEGARYAF'S EMPLOYMENT AT EQUITY
## AND HIS JOB OFFER FROM A COMPETITOR

7.      Equity hired Mr. Elmegaryaf in September of 2017 as an Associate with Equity's Investments team. As part of the Investments team, Mr. Elmegaryaf worked on valuations of single asset, multiple asset, and large portfolio acquisitions and sales. In January of 2021, Equity promoted Mr. Elmegaryaf to Assistant Vice President.

8.      When Mr. Elmegaryaf was on-boarded, he was given Equity's Code of Ethics and Business Conduct, which provided (and still provides) that "each employee and trustee must

safeguard and keep private all Company proprietary and confidential information and trade secrets" and further provides that when an employee leaves Equity, the employee's 'obligation to protect confidential information continues.'" All employees are periodically required to review and acknowledge the Code of Ethics and Business Conduct.

9.    A forensic analysis of Mr. Elmegaryaf's computer shows that he began running various searches relating to one of Equity's competitors ("Competitor")[1] in December of 2021, and that he began interviewing for a position there in or around January of 2022, ultimately receiving an offer of employment from Competitor on February 24, 2022.

10.    Mr. Elmegaryaf tendered his resignation from Equity on March 1, 2022.

### MR. ELMEGARYAF'S THEFT OF EQUITY'S TRADE SECRETS AND HIS ATTEMPTS TO COVER HIS TRACKS

11.    After receiving his offer from Competitor on February 24, and unbeknownst to Equity, Mr. Elmegaryaf began accessing and downloading Equity's trade secrets and other confidential and proprietary information in advance of his departure to Competitor.

12.    Forensic examination of Mr. Elmegaryaf's computer and USB drive revealed that on February 24, 2022, the same day he received his offer from Competitor, Mr. Elmegaryaf accessed certain of Equity's Google Drive folders containing confidential, proprietary, and trade secret information.

13.    Over the next eighteen days, Mr. Elmegaryaf downloaded reams of data from Equity's systems. For example, on March 15, 2022, Mr. Elmegaryaf accessed and downloaded numerous folders on Equity's Google Drive account – titled "Acquisitions," "JV Terms," "Investments," "New York – Investments," "Boston – Investments," "Dispositions –

---

[1] Equity has intentionally not disclosed the specific competitor involved but will do so upon the Court's request.

Investments," "Retail Activity Report – Investments," and "Development – Investments."  All of these folders contained highly sensitive confidential and trade secret information.

14.    Altogether, Mr. Elmegaryaf improperly and without authorization accessed, downloaded and, in some instances, emailed to personal devices over 12,000 files from Equity's system in advance of his last day at Equity, set for Monday, March 21, 2022.

15.    On Friday, March 18 (his penultimate day at Equity) Mr. Elmegaryaf copied Equity's confidential and trade secret information from his work computer onto an external USB drive. That same day he accessed two folders on Equity's Google Drive account – one titled "Acquisitions," the other titled "Current Deals – Acquisitions", both of which contained highly sensitive confidential and trade secret information. Mr. Elmegaryaf then copied the files from these folders onto a personal laptop. In addition, Mr. Elmegaryaf forwarded email correspondence, with attached files containing confidential and trade secret information, from his corporate email account to his personal email account.

16.    Equity's enterprise-grade data loss prevention solution alerted Equity to Mr. Elmegaryaf's unauthorized download and USB copy activity, prompting Equity to immediately revoke Mr. Elmegaryaf's network access on March 18th. The unusual activity also prompted Equity to initiate an internal investigation under the suspicion that prior to his departure, Mr. Elmegaryaf was deliberately accessing and exfiltrating Equity's confidential and trade secret information from his company-issued laptop onto a removable USB device.

17.    Upon learning of Mr. Elmegaryaf's conduct and the Incident, Equity's IT department that same day called Mr. Elmegaryaf to seek an explanation for the highly suspicious activity. During that call, Mr. Elmegaryaf provided untruthful responses to Equity's IT department in order to conceal the Incident. While he admitted to the USB downloads, he falsely

claimed that he downloaded the files for work. That claim was demonstrably false because many of the documents he stole had no relationship to the projects he had been working on in 2022. What is more, he failed to mention not only that he had improperly accessed Equity's Google Drive folders, but that the following Monday, March 21, was to be his last day at Equity. As a result, he had ceased "working" on anything at all for Equity and thus had no legitimate need for any of Equity's data.

18.    After the call ended, Mr. Elmegaryaf ran the following Google searches from his laptop computer:

- usb hard drive history

- how do you know if files on a usb have been backed up

- can you tell if items have been saved on a hard drive

- tracking changes on external hard drive

- can you tell if external hard drive was saved elsewhere

19.    He also accessed the following online articles after Equity called him to discuss his theft of 12,000 documents:

- Departing Employees and Data Theft - NowSecure

- Do portable external drives keep records of files that were copied to another drive? If so, how do I access it? - Quora

- How to track someone's activity on my external hard disk - Quora

- How to Decide if You Should File a Lawsuit Against Your Former Employee for Trade Secret Theft - California business attorneys | Oakland CA

- Data Theft by Departing Employees: A Bigger Threat Than Hackers - BIA

20.    The next day, Saturday March 19, Equity senior officers Matt Koritz and Scott Fenster called Mr. Elmegaryaf regarding the Incident. Again, Mr. Elmegaryaf misled Equity in

– 5 –

order to conceal his wrongdoing. Mr. Elmegaryaf first denied downloading large amounts of a data to any personal devices. Mr. Elmegaryaf then admitted to downloading certain files to a USB drive, but he specifically, and falsely, denied having downloaded documents from Equity's Google Drive account. Equity and Mr. Elmegaryaf agreed to meet the following Monday, March 21, to discuss the Incident.

21.     Following his conversation on the 19th with Equity personnel, Mr. Elmegaryaf deleted over 1,700 of Equity's files from his personal laptop computer, in yet another attempt to hide his wrongdoing in advance of his meeting with Equity personnel.

22.     That same day, out of a concern that Mr. Elmegaryaf had not been forthcoming in his conversations with Equity and may have given the stolen documents to Competitor (his soon-to-be new employer), and in order to ensure the security of its confidential and trade secret information contained in the exfiltrated data, Equity's Chief Investment Officer alerted Competitor that Mr. Elmegaryaf was in possession of Equity's confidential and trade secret information and sought assurances that the information was not already on Competitor's servers and would not be placed there in the future.

23.     On Monday, March 21, Mr. Elmegaryaf met with personnel from Equity's IT department at Equity's office in Manhattan to address the incident. Again, Mr. Elmegaryaf was not forthcoming. He first denied that he had taken a significant volume of data from Equity, and after being confronted with a spreadsheet that listed each of the 12,000 downloaded files, he claimed those files did not contain any confidential and trade secret information.

24.     At the meeting, he turned over the USB drive as well as his personal laptop computer for forensic examination. In addition, he provided access to his personal Gmail account in order to delete the emails he had forwarded to himself from his Equity email account. During

that meeting, and in the ensuing weeks, in order to avoid this lawsuit while, at the same time, taking the necessary steps to protect its property, Equity tried to negotiate an agreement with only contractual promises under penalty of perjury from Mr. Elmegaryaf concerning Equity's data/property (at that point, with no demand for monetary relief in favor of Equity and, initially, no demand for a release in favor of Equity). Nothing has come of Equity's efforts, only further elevating Equity's concerns and the need for injunctive relief.

25.    After the March 21 meeting at Equity's Manhattan office, Equity engaged a third-party cybersecurity and compliance solutions and services firm to conduct a forensic examination of Mr. Elmegaryaf's laptop as well as of the USB drive onto which Mr. Elmegaryaf had downloaded Equity's data. In the course of that examination, Equity confirmed that Mr. Elmegaryaf had downloaded over 12,000 of Equity's files, that he had deleted over 1,700 of Equity's files from his computer following his call with Equity personnel on March 19, and that he had researched how to hide the electronic trail that his activities had left.

26.    The forensic experts were unable to determine whether the data copied onto Mr. Elmegaryaf's computer and USB drive had been copied onto separate devices before being turned over to Equity, and thus Equity does not know, *inter alia,* whether Mr. Elmegaryaf still possesses or has further distributed the stolen data.

27.    The data Mr. Elmegaryaf exfiltrated from Equity include entire folders belonging to Equity's Investments team. The files include a myriad of current and historic information concerning Equity's properties, operations, redevelopment plans and potential acquisitions—from pictures and building plans to budgets and projected capital expenditures; from individual lease documents to entire rent rolls; from inconsequential documents about a property's operations to documents prepared by Equity's internal legal team identifying issues to be

evaluated in connection with potential property dispositions; and more. Of greatest concern to Equity, the files include valuation and acquisition modeling files which as a whole set out the process Equity follows to value assets. And certain individual documents therein do not just disclose the process for calculating net asset values but disclose Equity's actual calculations of net asset values for Equity properties over time. These critical documents are trade secrets that contain material, non-public information, and are relied upon by Equity to make capital allocation and financing decisions, among other things. In addition, Mr. Elmegaryaf took files that reflect valuations of potential acquisitions which reveal Equity's methodologies for such valuation. These critical documents are also trade secrets that would provide a competing buyer of such properties or a seller of such properties an advantage over Equity in any transaction involving those properties.

28.     Equity makes significant investments in, *inter alia,* its personnel to develop and implement the data and processes that Mr. Elmegaryaf misappropriated. The acquisition of that trade secret and confidential information by an investment and asset management company like Competitor would give that company a clear competitive advantage in transactions involving the subject properties, as well as material non-public information concerning the value of Equity's publicly traded securities.

29.     Equity takes material steps to protect its confidential information and trade secrets. The Google drive folders Mr. Elmegaryaf accessed and downloaded documents from are not publicly accessible. Equity's network resources require an intentional sign-in with multiple authentication factors. Further, the Google drive folders Mr. Elmegaryaf accessed are not accessible to all Equity employees. Equity only allows access for certain employees on a need-to-know basis, and such access is strictly controlled. In fact, with respect to certain of the files

Mr. Elmegaryaf downloaded, when they must be shared internally, they are shared in a for-eyes-only format without the ability to download or print. Mr. Elmegaryaf only had access to these folders because of the work he performed for Equity as part of the Investments team.

## COUNT I
### (MISAPPROPRIATION OF TRADE SECRETS UNDER THE DEFEND TRADE SECRETS ACT)

30.    Equity repeats and realleges the allegations contained in paragraphs 1 through 29, above.

31.    Mr. Elmegaryaf undertook a deliberate plan to acquire Equity's trade secret information through improper means. The data he downloaded, copied to his laptop computer and/or a USB device, and/or emailed to his personal email address improperly and without authorization included nonpublic trade secret information that Equity has diligently sought to protect from disclosure and that derives value from its secrecy. His actions constitute a violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836.

32.    The trade secret information that Mr. Elmegaryaf misappropriated from Equity concerns and has been used in interstate commerce, as evidenced by the information's relation to properties located in several different states and to the interstate nature of the financing arrangements reflected on those documents.

33.    Equity is entitled to preliminary and permanent injunctive relief prohibiting Mr. Elmegaryaf's possession, use, or disclosure of Equity's trade secret and confidential information, in addition to monetary damages in an amount to be proved at trial.

## COUNT II
### (MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW)

34.    Equity repeats and realleges the allegations contained in paragraphs 1 through 33, above.

35.     Mr. Elmegaryaf obtained Equity's trade secret information in breach of the Code of Ethics and Business Conduct, in breach of his duty loyalty to Equity, and through improper means by exceeding the scope of his authorized access to Equity's confidential and trade secret information.

36.     The data Mr. Elmegaryaf downloaded, copied to his laptop computer, and/or emailed to his personal email address improperly, without authorization, and in bad faith, included nonpublic trade secret information that Equity has diligently sought to protect from disclosure and that derives value from its secrecy.

37.     Equity is entitled to, *inter alia*, preliminary and permanent injunctive relief prohibiting Mr. Elmegaryaf's possession, use, or disclosure of Equity's trade secret and confidential information.

**COUNT III**
**(MISAPPROPRIATION OF TRADE SECRETS**
**UNDER THE ILLINOIS TRADE SECRETS ACT)**

38.     Equity repeats and realleges the allegations contained in paragraphs 1 through 37, above.

39.     Mr. Elmegaryaf undertook a deliberate plan to acquire Equity's trade secret information through improper means. The data he downloaded, copied to his laptop computer, and/or emailed to his personal email address improperly and without authorization included nonpublic trade secret information that Equity has diligently sought to protect from disclosure and that derives value from its secrecy. These actions violated his duties to his then employer, Equity. His actions constitute a violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq*.

40.     Equity is entitled to preliminary and final injunctive relief prohibiting Mr. Elmegaryaf's possession, use, or disclosure of Equity's trade secret and confidential information.

Equity is also entitled to monetary damages in an amount to be determined at trial, plus exemplary damages and attorney's fees based on the willful and malicious nature of Mr. Elmegaryaf's misappropriation.

## COUNT IV
### (BREACH OF FIDUCIARY DUTY)

41.     Equity repeats and realleges the allegations contained in paragraphs 1 through 40, above.

42.     Mr. Elmegaryaf owed a duty of loyalty to Equity to act in good faith and with the best interest of the company in mind. Mr. Elmegaryaf breached this duty when he put his personal interests ahead of the interests of Equity by accessing and copying voluminous amounts of Equity's confidential and trade secret information, which Mr. Elmegaryaf intended to use in competition with Equity at his new employer.

43.     Mr. Elmegaryaf also had a duty to safeguard and protect Equity's confidential and trade secret information. Mr. Elmegaryaf breached this duty when he accessed and copied Equity's confidential and trade secret information to his personal laptop and USB drive in a non-secure manner and in violation of Equity's Code of Ethics and Business Conduct.

44.     Equity is entitled to preliminary and permanent injunctive relief prohibiting Mr. Elmegaryaf's possession, use, or disclosure of Equity's trade secret and confidential information, in addition to monetary damages in an amount to be proved at trial.

### PRAYER FOR RELIEF

WHEREFORE, Equity prays that judgment be entered in its favor and against Mr. Elmegaryaf and prays for the following relief:

(a) For Count I, a preliminary and permanent injunction against Mr. Elmegaryaf prohibiting him from maintaining, using or disclosing Equity's trade secret information as well as monetary damages in an amount to be proved at trial;

(b) For Count II, a preliminary and permanent injunction against Mr. Elmegaryaf prohibiting him from maintaining, using or disclosing Equity's trade secret information as well as monetary damages in an amount to be proved at trial.

(c) For Count III, a preliminary and permanent injunction against Mr. Elmegaryaf prohibiting actual or potential misappropriation or dissemination of Equity's trade secret information by Mr. Elmegaryaf, plus monetary damages in an amount to be proved at trial, along with exemplary damages and attorney's fees;

(d) On Count IV, monetary damages in an amount to be proved at trial, plus a preliminary and permanent injunction against Mr. Elmegaryaf prohibiting him from maintaining, using or disclosing Equity's trade secret and confidential information.

Dated:  April 25, 2022
      New York, New York

 

                                                            Respectfully submitted,

                                                            BAKER & HOSTETLER LLP

                                                            By:    *Torello H. Calvani*
                                                                  Torello H. Calvani

John S. Letchinger                                            Email: tcalvani@bakerlaw.com
(pro hac application pending)                                Nicholas M. Rose
Email: jletchinger@bakerlaw.com                      Email: nrose@bakerlaw.com
One North Wacker Drive                                45 Rockefeller Plaza, 14th Floor
Chicago, Illinois 60606                                New York, New York 10111
Telephone: 312.416.6200                               Telephone: 212.589.4200
Facsimile: 312.416.6201                               Facsimile: 212.589.4201

                                                  *Attorneys for Plaintiff ERP Operating Limited*

– 13 –